**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 13 |
| RUSSELL K. MATERNE, | ) | Case No. 20-40027-CJP |
| | ) | |
| Debtor | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 13 |
| DOMINIQUE J. GNAMAN, | ) | Case No. 19-40930-CJP |
| | ) | |
| Debtor | ) | |
| | ) | |

## <u>MEMORANDUM OF DECISION</u>

Before the Court are objections by secured creditors to confirmation of Chapter 13 plans

in two unrelated cases. While the plans and the confirmation objections of the secured creditors

are not identical, the cases share certain common issues presented by Chapter 13 "sale" plans,

pursuant to which a debtor treats the claim of a secured creditor, including prepetition arrears, by

proposing to sell the debtor's principal residence that secures the mortgage during the term of the

plan. In the plans before me, the debtors do not specify a time for the sales to occur, such that

the sales could take place at any time before the respective plan terms expire. As the objections

to confirmation raise overlapping legal issues related to sale plans, I am issuing a single

memorandum of decision to address the issues together. For the reasons set forth below, I will

sustain the objections of the secured creditors in each of the cases.[1]

---

[1] The objections to confirmation raise questions of law that can be resolved on the pleadings without an
evidentiary hearing. The facts referenced in this decision are either undisputed or from the Court's
dockets of which I have taken judicial notice. *See LeBlanc v. Salem (In re Mailman Steam Carpet*

# I.   FACTS AND PROCEDURAL HISTORY

## A.   Dominique J. Gnaman

On June 6, 2019, Dominque J. Gnaman filed a petition for relief under Chapter 13 of the Bankruptcy Code. Wilmington Trust, NA, successor trustee to Citibank, N.A., as Trustee for Structured Asset Mortgage Investments II Inc., Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-4 ("Wilmington") is the current holder of the first mortgage of the real property located at 102 Jordan Road, Franklin, Massachusetts (the "Franklin Property"). The debtor owns the single-family Franklin Property individually and values it at $553,655.00 on Schedule A/B. There is no dispute that this is Mr. Gnaman's principal residence. On Schedule C, Mr. Gnaman claims a homestead exemption in the Franklin Property in the amount of $500,000.00 under Mass. Gen. Laws ch. 188, § 3. Wilmington, through its servicer, Select Portfolio Servicing, Inc., filed a secured proof of claim in the amount of $411,417.95, including prepetition arrears of $206,561.84.

Wilmington objects (Case No. 19-40930, Dkt. No. 36) to confirmation of the Chapter 13 plan (Case No. 19-40930, Dkt. No. 26) proposed by Mr. Gnaman.[2] Mr. Gnaman seeks to cure his prepetition arrears by selling the property that secures Wilmington's mortgage at any time up to the conclusion of the plan's 60-month term. The plan provides that, until the property is sold, Mr. Gnaman will pay contractual monthly mortgage payments directly to Wilmington. Mr. Gnaman proposes to pay Wilmington the full amount of its claim from proceeds of the proposed

---

*Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (observing "[t]he bankruptcy court appropriately took judicial notice of its own docket").

[2]  The Chapter 13 trustee, Denise M. Pappalardo (the "Trustee"), also objected to Mr. Gnaman's plan for failing to meet to the "best efforts" test under 11 U.S.C. § 1325(b)(1) (Case No. 19-40930, Dkt. No. 45) (the "Trustee's Objection"), alleging that the debtor does not devote all of his disposable income to the plan because his means test calculation is understated. *See* Tr. Obj.; Gnaman Tr. Obj. Resp. (Case No. 19-40930, Dkt. No. 49). The Court has entered a separate decision sustaining the Trustee's objection.

sale.  Wilmington objects to this treatment, asserting that it violates §§ 1325(a)(3), (a)(5), and (a)(6) and 1322(b)(5) of the Bankruptcy Code.[3]

Mr. Gnaman addresses Wilmington's secured claim in two sections of his plan, each of which must be considered to determine Wilmington's plan treatment.  Part 3.A.2 of the plan, *Maintenance of Contractual Installment Payments (To Be Paid Directly to Creditors)*, provides that Mr. Gnaman will directly maintain contractual mortgage payments to Select Portfolio Servicing, Inc.[4] "outside" of the plan, meaning that the debtor will make the payments directly to the mortgagee, instead of through the Trustee as a conduit.[5]  Additionally, in Part 8.6 of the plan, *Nonstandard Plan Provisions*, the debtor proposes to pay the balance of the mortgage claim of Wilmington in a lump sum (sometimes called a "balloon payment"), including prepetition arrearages, through the sale of the Franklin Property.  Mr. Gnaman's plan specifically provides that:

> Subject to further order of the Court[,] the Debtor is to sell his real property located at 102 Jordan Rd., Franklin, MA 02038-1219[.]

> Proceeds of the sale shall be distributed as follows:

> (1) To pay any secured claim against the property[,] including a mortgage to Select Portfolio Servicing, Inc[;]

---

[3]  Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code" or the "Code").

[4]  Mr. Gnaman names Select Portfolio Servicing, Inc. ("Select Portfolio") as the holder of Wilmington's claim in his plan.  Select Portfolio is the servicer.

[5]  As explained by one commentator, "since October 1, 1979, the Bankruptcy Code has contemplated that a Chapter 13 plan must address all claims against the debtor; there is no such thing as paying a creditor 'outside the plan.'  The phrase 'outside the plan' is a remnant from pre-Bankruptcy Code practice . . . The inability to provide for secured debts without consent was explicitly changed by § 1322(b)(2) of the Bankruptcy Code and the pre-Bankruptcy Code practice of paying nonconsenting secured claims 'outside' the plan was effectively abolished. The Bankruptcy Code now allows for confirmation of a plan without the acceptance of secured creditors, and contemplates that all claims (including secured debt) will be dealt with through the Chapter 13 plan."  2019 No. 10 Norton Bankr. L. Adviser,  Still the Same: Direct Payments In Chapter 13 Are "Payments Under the Plan," 1.

(2) To pay any expenses associated with a real estate transaction, including but
not limited to, attorney's fees, closing costs, realtor commissions;
(3) Any exempt funds shall be retained by the debtor; and
(4) Any non-exempt funds shall be turned over the standing trustee to pay
creditors.

Gnaman Plan 6, Part 8.6.

Mr. Gnaman left Part 3.A.1 of the plan blank, which references "prepetition arrears to be

paid through this plan." There is also no timetable associated with the sale of the Franklin

Property, so Mr. Gnaman is proposing to retain the Property for a period of up to 60 months in

which he would sell the Franklin Property and pay Wilmington's claim balance from the sale

proceeds of its collateral. The debtor does not provide for any alternative treatment of

Wilmington's claim if the Franklin Property is not sold during the 60-month plan period.

There does not appear to be any sale presently in prospect. Mr. Gnaman has never sought

to employ a broker to list the Franklin Property in his case. Wilmington also asserts, upon

information and belief, the property is not listed for sale.

In its objection, as supplemented by its additional briefing, Wilmington objects to the

plan on numerous grounds.[6] Specifically, Wilmington argues that (i) cure of Mr. Gnaman's

default under a 60-month sale plan is an unreasonable period of time and, because it is does not

provide for cure "within a reasonable time," runs afoul of the anti-modification provision of §

1322(b)(2); (ii) the "balloon" payment contemplated through the sale to cure the prepetition

arrears violates § 1325(a)(5)(B)(iii)(I) requiring periodic payments to be in "equal amounts"; (iii)

the plan is not feasible under § 1325(a)(6) given the lack of movement toward a sale or

---

[6] Wilmington's objection, as originally filed, focused on the plan's compliance with §§ 1322(b)(2) and
1325(a)(5)(B)(iii)(I). Wilmington stated that "a sixty month sale plan is unreasonable and does not
comply" with the foregoing provisions. Wilmington Obj. ¶ 9 (Case No. 19-40930, Dkt. No. 36).

guideposts for progress regarding the sale process; and (iv) the plan is not proposed in good faith pursuant to § 1325(a)(3) for those same reasons.

### B.    Russell K. Materne

On January 7, 2020, Russell K. Materne filed a petition for relief under Chapter 13 of the Bankruptcy Code. Bank of America, National Association ("BoA") holds both the first and second mortgages of the real property located at 140 Oak Knoll Road, Carlisle, Massachusetts (the "Carlisle Property"). The debtor owns the single-family Carlisle Property with his non-filing spouse as tenants by the entirety and values his interest at $1,320,000.00 on Schedule A/B. There is no dispute that this is Mr. Materne's principal residence. On Schedule C, Mr. Materne claims a homestead exemption in the Carlisle Property in the amount of $500,000.00 under Mass. Gen. Laws ch. 188, § 3. BoA, through its servicer, PNC Bank, National Association ("PNC Bank"), filed a secured proof of claim for the first mortgage in the amount of $889,187.51, including prepetition arrears of $243,367.33. BoA filed a secured proof of claim for its second mortgage in the amount of $82,463.70, including prepetition arrears of $8,373.42.

BoA has filed two separate objections to confirmation, (Case No. 20-40027, Dkt. No. 50, the "First Mortgage Objection")[7] and (Case No. 20-40027, Dkt. No. 68, the "Second Mortgage Objection"), of the debtor's Chapter 13 plan (Case No. 20-40027, Dkt. No. 25).[8] Mr. Materne proposes to cure his prepetition arrears by selling the property that secures BoA's first and second mortgages at any time prior to the conclusion of the plan's 36-month term. Until the property is sold, Mr. Materne proposes to make monthly "adequate protection" payments to BoA

---

[7] This is BoA's amended objection regarding the first mortgage as the initial objection erroneously addressed cure through modification instead of cure through sale.

[8] Regarding the first mortgage, BoA has also moved for relief from the automatic stay with respect to the first mortgage, (Case No. 20-40027, Dkt. No. 62), which motion has been stayed pending resolution of the First Mortgage Objection, and for an interim distribution (Case No. 20-40027, Dkt. No. 119).

in amounts less than the monthly payments provided under BoA's first mortgage and less than the amount of the monthly escrow for insurance and real estate taxes required by that mortgage. In the First Mortgage Objection, BoA objects to this treatment, asserting that it violates §§ 1325(a)(1), (a)(3), (a)(5), and (a)(6) and 1322(b)(2).  In the Second Mortgage Objection, BoA does not focus on specific provisions at issue, but generally references §§ 1322 and 1325 and objects to the fact that, although the plan proposes a sale, there is no time limit on the sale term and no realtor has been retained.[9]

With respect to the specific treatment of BoA under his plan, Mr. Materne marked "none" in Part 3 of the plan governing secured claims and  addresses the BoA claims entirely in Part 8 of his plan, *Nonstandard Plan Provisions*.  In Part 8.7 of the plan, which the debtor captions "[t]reatment of secured lender mortgage / sale [p]lan," the debtor notes that he and his non-filing spouse will sell the Carlisle Property, which will be subject to further order of the Court, and that the claims of BoA, including prepetition arrearages, will be paid in a lump sum from the proceeds of such sale.  The plan specifically provides that:

Proceeds of the sale shall be distributed as follows:

(1) To pay any secured claim against the property[, u]pon information and belief there is a first and second mortgage held against the [Carlisle Property] to Pnc Mortgage[;]
(2) To pay any expenses associated with a real estate transaction, including but not limited to, attorney's fees, closing costs, realtor commissions;
(3) The non-filing spouse shall retain her 50% interest in the net sale proceeds;
(4) Any exempt funds shall be retained by the debtor; and
(5) Any non-exempt funds, to the extent necessary to pay claims, shall be turned over the standing trustee to such creditors.

---

[9]  With respect to the Second Mortgage Objection, Mr. Materne filed a response denying allegations and stating the objection should be stricken because it was filed late. Debtor's Resp. (Case No. 20-40027, Dkt. No. 70).  Given the circumstances of this case, including that similar issues need to be addressed in conjunction with the First Mortgage Objection, I decline to strike the Second Mortgage Objection.

Materne Plan 5.  Additionally, in Part 7.a of the plan, Mr. Materne proposes the following

"Adequate Protection/Maintenance Payments" to PNC Mortgage and BoA[10]:

> The Chapter 13 Trustee is to make monthly adequate protection / maintenance payments to the secured lender in the amount of $1,525.50 per month. Said payment shall include impounding for property tax and property insurance.
>
> The adequate protection payment shall cease upon the earliest of (1) dismissal of the case, (2) [conversion] of the case to another chapter, (3) the filing of a further amended plan, (4) [a]pproval by the Court of a [h]ome loan [m]odification, (5) Order of the Court to cease the payments on the [m]otion of the [d]ebtor or other interested party, [or] (7) [t]he Court granting relief from the automatic stay as to the subject property.

*Id.*[11]

There is no timeline proposed for the sale of the Carlisle Property, so Mr. Materne is

proposing to retain the Carlisle Property for a period of up to 36 months during which he and his

non-debtor spouse would sell the property and pay BoA's claims in full from the sale proceeds.

The debtor does not provide for any alternative treatment of BoA's claims if the Carlisle

Property is not sold during the plan term.  With respect to the first mortgage, BoA states that the

monthly post-petition mortgage payments total $4,727.63 and that the proposed adequate

protection payments of $1,525 do not cover the tax and insurance escrow amount of $1,931.70.

There does not appear to be any sale presently in prospect regarding the Carlisle

Property.  Mr. Materne notes he has been "self-marketing" the property since the commencement

of the case and that he is working on unspecified improvements to the property "to make it more

marketable."  Materne Br. 3 (Case No. 20-40027, Dkt. No. 89).  In his response to the First

Mortgage Objection, Mr. Materne states he has employed a real estate broker, *see* Materne Resp.

---

[10]  Mr. Materne references both PNC Mortgage and BoA in the plan.  PNC Bank is the servicer with respect to first mortgage as reflected in Claim No. 6.

[11]  The list in Mr. Materne's plan is misnumbered, as number six is missing.

¶ 3 (Case No. 20-40027, Dkt. No. 53), but the debtor has not filed any application with the Court seeking to employ a broker and never mentioned an outside broker in his supplemental briefing. In the First Mortgage Objection, BoA asserts that pursuant to an internet search conducted at the time of the objection, the Carlisle Property is not listed for sale.

In the First Mortgage Objection, as supplemented,[12] BoA argues that (i) Mr. Materne's attempt to reduce contractual payments and cure the prepetition default through a sale is a modification that violates the anti-modification provision of § 1322(b)(2), citing, among other cases, *Nobleman v. Am. Sav. Bank*, 508 U.S. 324 (1993), and disputing Mr. Materne's contention that the claim is being paid in full without modification under § 1325(a)(5)(B); (ii) the proposed adequate protection payments are impermissible and Mr. Materne's reliance on §§ 361, 362 and § 1322(b)(11) to support such payments is misplaced; (iii) the plan is not feasible under § 1325(a)(6) given no timeline is included for the sale and lack of concrete progress towards a sale, notwithstanding the debtor's purported self-marketing of the property; and (iv) the plan is not proposed in good faith pursuant to § 1325(a)(3) for those same reasons.  In the Second Mortgage Objection, in addition to general objections as to the unlimited sale term and lack of progress toward a sale, BoA asks for clarification of the "amount of adequate protection to be paid to each creditor while [a] sale is attempted."  Second Mortg. Obj. ¶ 5 (Case No. 20-40027, Dkt. No. 68).

---

[12]  In addition to a memorandum of law in support of its objection, *see* BoA Memo. of L. (Case No. 20-40027, Dkt. No. 90), BoA also filed a supplement to the First Mortgage Objection, stating that since the filing of the objection, two other judges in this District have considered similar confirmation objections in other cases, *In re Baptiste* (Case No. 19-13074) (Hoffman, J.) and *In re Suffoletta* (Case No. 20-10880) (Bostwick, J.), and have ruled from the bench that modification of a secured creditor's right to receive the contractual monthly payment due pursuant to the terms of its loan documents is impermissible. see BoA Suppl. (Case No. 20-40027, Dkt. No. 80).  BoA provided the transcripts of the hearings as an attachment to the supplement at Dkt. No. 80.

Mr. Materne responded that he was "unable to respond to the request of the lender for clarification." Materne Resp. ¶ 5 (Case No. 20-40027, Dkt. No. 70).

## II.   JURISDICTION

This Court has jurisdiction over confirmation of a plan, which arises under the Bankruptcy Code, pursuant to 28 U.S.C. §§ 157(a) and 1334 and Rule 201 of the Local Rules of the United States District Court for the District of Massachusetts. The confirmation of a plan and the objections thereto are core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(A) and (L). Accordingly, I have authority to enter a final order with respect to each of confirmation objections in these matters.

## III.   DISCUSSION

A court shall confirm a Chapter 13 plan if it meets all of the confirmation requirements of § 1325(a) and complies with the rest of the Code. *See* 11 U.S.C. § 1325(a)(1). "[T]he burden is on the debtor to prove that each of the statutory criteria for confirmation is met." *Austin v. Bankowski*, 519 B.R. 559, 563 (D. Mass. 2014).

The debtors' plans provide that the secured claims of Wilmington and BoA, respectively, including amounts necessary to cure prepetition arrearages, will be paid in full through a sale at some unspecified time during the term of the plan. Each of the debtors request that his plan be confirmed over the secured creditors' objections and attempt to cure prepetition arrearages through a sale, although in Mr. Materne's case, the debtor takes great care to avoid characterizing his treatment of BoA's claims as a "cure" of prepetition arrears.[13] Both debtors

---

[13] Mr. Materne argues:

> It would be easy to read the plan as a "cure" plan, but the Debtor has not used the term "cure" in the plan. The Debtor has not listed the mortgage claims in part 3 of the plan. The Debtor is not treating the mortgage claims under 11 U.S.C. §1322 (b) (3) or (5).

contend that their plans appropriately treat the claims of the secured creditors under §
1325(a)(5)(B), to the extent applicable, by providing for full payment of the secured claims.  The
debtors also each assert that subparagraph (iii)(I) of § 1325(a)(5)(B) (which shall be referred to
herein as the "equal payments provision") is not triggered because payments are being made
pursuant to the sale and not in monthly periodic payments.  As to the Gnaman plan, presumably
the debtor views contractual maintenance payments being paid directly by the debtor, as opposed
to through the Trustee, as meaning the claim is not "provided for by the plan."  Mr. Materne
contends that his proposed "adequate protection" payments are not subject to the equal payments
provision because, while intended to be made by the Chapter 13 Trustee from plan payments, he
does not intend those payments to be periodic payments to cure or maintain BoA's secured
claim.

With respect to the Wilmington objection, Mr. Gnaman also acknowledges in his
supplemental brief that the plan is silent as to which subsection of § 1322 governs the plan's cure
and maintain provisions, but clarifies that, in addition to § 1322(b)(5), "the Debtor is also
treating the mortgage claim under [§ 1322(b)(3) and (8)]."  Gnaman Br. 5 (Case No. 19-40930,
Dkt. No. 66).  With respect to the First Mortgage Objection, Mr. Materne claims that he is not
treating the BoA claims under §§ 1322(b)(2), (b)(3), or (b)(5) and that by paying the claims in
full, he does not need to look to the permissive provisions of § 1322 to propose a confirmable
plan, but that, if necessary, § 1322(a)(8) supports his proposed treatment of the secured claims.
Mr. Materne contends that the plan otherwise complies with § 1325(a)(5)(B) by paying the

---

Rather the Debtor is simply paying the claims in full through the sale of the property.
It is completely unnecessary to use any provision of 11 U.S.C. §1322 (b) for the full
payment of a claim.

Materne Br. 5 (Case No. 20-40027, Dkt. No. 89).

claims in full upon sale. *See* Materne Br. 5 (Case No. 20-40027, Dkt. No. 89). With respect to the adequate protection payments, Mr. Materne argues that the payment in no way modifies the claim and that § 1322(b)(2) would be satisfied, because the contractual payment amounts are not being altered, they are just "delayed" until the property is sold. *Id.* at 6–7. Mr. Materne asserts that adequate protection payments less than the full monthly contractual amount are appropriate pursuant to § 1322(b)(11), the catch-all provision that allows a debtor to "include any other appropriate provision not inconsistent with this title" in a plan. *Id.*

Each debtor argues that the unrestricted duration of obtaining a sale over the life of a Chapter 13 plan is appropriate, arguing that the only temporal limitation under the Bankruptcy Code to effectuate a "cure through sale" is the statutory plan term limit under § 1322(d). Presumably, the debtors' contention that § 1322(b)(5) is not applicable to their proposed treatments of the secured creditors are intended to bolster this argument because I would not need to examine the "reasonable time" or "maintenance of payments" components of that provision in analyzing whether the plans could be confirmed over the objections of the secured creditors. Because the sale plans filed by these debtors illustrate common issues presented by Chapter 13 plans where debtors attempt to retain possession of their homes pending a sale, but are unable or unwilling to propose "cure and maintain" plans that provide for cure of prepetition arrearages in equal payments over the life of a plan and maintenance of postpetition contractual payments, I address them together to provide guidance as to how I will apply the statute in considering confirmation of similar plans and to set out my analysis should any party wish to seek appellate review to provide further clarity with respect to these issues.

### A.    Application of §§ 1322(b) and 1325(a)(5)

"Sections 1322 and 1325 establish, respectively, the content and methods of confirming a proposed reorganization plan." *Wells Fargo Bank, N.A. v. Sagendorph (In re Sagendorph)*, 562

B.R. 545, 547 (D. Mass. 2017).  Provisions of the Bankruptcy Code governing confirmation of a

Chapter 13 plan have been subject to varying judicial interpretation, and the amendments to the

Code provided in Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

(BAPCPA) appear to have further muddied the waters.[14]  Given the wide-ranging interpretations

of the same provisions by courts, confirmation options for debtors are not uniformly defined.[15]

For example, the equal periodic payment amendment incorporated into § 1325(a)(5)(B)(iii)(I)

has been interpreted as both prohibiting and permitting balloon payments at the end of plan

terms.  *Compare Hamilton v. Wells Fargo Bank, N.A. (In re Hamilton)*, 401 B.R. 539, 541, 543

(B.A.P. 1st Cir. 2009) (determining "a balloon payment is not equal to the payment that preceded

it, and thus violates § 1325(a)(5)(B)(iii)(I)"); *In re Benedicto*, 587 B.R. 573, 576 (Bankr. S.D.

Fla. 2018) (holding "[t]o find that the final payment is not recurring, and therefore is not

periodic, is a stretch") *with In re Cochran*, 555 B.R. at 898 (concluding provision does not

prohibit balloon payments; "[a] balloon payment satisfies the debt in full, and thus by definition

cannot be repeated periodically, whether in equal amounts or otherwise").  Additionally, the

difference between a debtor's ability to cure pursuant to §§ 1322(b)(3) and (b)(5) and the

---

[14]  As one commentator has observed regarding decisions reported after the effective date of BAPCPA,
"[s]tartling and contradictory decisions interpreting new provisions of Chapter 13 are still an almost daily
occurrence."  Keith M. Lundin, Lundin on Chapter 13, § 3.1, at ¶ 5, LundinOnChapter13.com (last visited
April 6, 2022).

[15]  I recognize that this is, in part, a result of the intent of Congress to allow debtors certain flexibility in
dealing with creditors.  *See, e.g., Ameriquest Mortg. Co. v. Nosek (In re Nosek),* 544 F.3d 34, 41 (1st Cir.
2008) (stating that "[§ 1322(b)] offers a Chapter 13 debtor flexibility in the formulation of her bankruptcy
plan by listing various elements that the debtor may include in her plan"); *In re Cochran,* 555 B.R. 892,
899 (Bankr. M.D. Ga. 2016) (explaining that "[t]he legislative history of the original statutes indicates
that Congress intended for debtors to have flexibility as to the property that is distributed on account of a
secured creditor's claim." (citations omitted); *In re Parker*, 15 B.R. 980, 985 (Bankr. E.D. Tenn. 1981),
*aff'd sub nom. Matter of Parker*, 21 B.R. 692 (E.D. Tenn. 1982) (citing S.Rep.No.95-989, 95th Cong., 2d
Sess. 141 (1978) and concluding Congress intended for debtors to have flexibility in dealing with their
creditors).

relationship of those provisions with the prohibition against modifying debts secured by a

debtor's principal residence has also been the subject of differing legal conclusions. *Compare,*

*e.g., Anderson v. Hancock*, 820 F.3d 670, 674 (4th Cir. 2016) (embracing a narrow view of a

debtor's ability to cure defaults under §§ 1322(a)(3) and (5)) *with Di Pierro v. Taddeo (In re*

*Taddeo)*, 685 F.2d 24, 27 (2d Cir. 1982) (concluding that "the power to 'cure any default'

granted in [§] 1322(b)(3) and (b)(5) is not limited by the ban against 'modifying' home

mortgages in [§] 1322(b)(2) because we do not read 'curing defaults' under (b) (3) or 'curing

defaults and maintaining payments' under (b)(5) to be modifications of claims."); *In re*

*McDonald*, 397 B.R. 175, 178 (Bankr. D. Me. 2007) (holding that "§ 1322(e) did nothing to

upset [the] determination [in *Rake v. Wade*, 508 U.S. 464 (1993)] that a cure proposal under §

1322(b)(5), with or without interest, is a proposal to modify a secured claim under a plan. As

such, it must meet the requirements of § 1325(a)(5)"). One commentator has also raised the

question as to whether a secured claim having a term longer than the plan term can be properly

addressed by a debtor's "compliance with § 1322(b)(5) without also being entitled to satisfaction

in one of the three ways provided in § 1325(a)(5)." Lundin on Chapter 13, § 78.4, at ¶ 18

(speculating that "Congress just overlooked the need for a cross-reference to § 1322(b)(5) in the

list of ways to satisfy an allowed secured claim holder in § 1325(a)(5)"); *In re Gordon*, 217 B.R.

973, 975–76 (Bankr. S.D. Ga. 1997) (harmonizing §§ 1325(a)(5) and 1322(b)(5) in considering

the treatment of a secured IRS claim by concluding that that the "total value distributed to the

[secured creditor], therefore, is the cash reduction in the principal balance which was owed on

the date of filing and a nondischargeable unpaid balance [and c]ombining these two value

components meets the requirements of § 1325(a)(5)," but recognizing the awkwardness of that

construction.). In considering the confirmation objections to the plans in these cases, I must

wade into these muddy waters and address the circumstances of when a  "sale" plan may be confirmed over the objection of a home mortgage lender.

Determination of the objections to confirmation of the "sale" plans in these cases require me to construe several provisions of both §§ 1322 and 1325.  A presumption generally exists that Congress means what it says in a statute.  *See, e.g., Montreal, Maine & Atlantic Railway, Ltd.*, 558 B.R. 473, 491 n.16  (B.A.P. 1st Cir. 2016), *aff'd*, 953 F.3d 29 (1st Cir. 2020) ("'[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (collecting authorities)).  "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quotation and citation omitted).  Unless "sufficient indication to the contrary," words will be interpreted "taking their ordinary, contemporary, common meaning."  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993) (quotation and citation omitted).  In interpreting the plain language of the statute, I also look to "the specific context in which the language is used, and the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

As discussed, § 1325(a) provides that the court shall confirm a Chapter 13 plan if that plan meets the requirements set out in that section.  *See* 11 U.S.C. § 1325(a).  With respect to each allowed secured claim "provided for by the plan,"  § 1325(a)(5) enumerates three alternative options, for a debtor proposing a plan, only one of which must be satisfied: (i) obtain the acceptance of the holder of the secured claim, § 1325(a)(5)(A), (ii) satisfy the conditions of "cramdown" by providing in the plan that the holder of the allowed secured claim will retain its lien and receive distributions under the plan having a present value equal to the amount of the allowed secured claim, § 1325(a)(5)(B), or (iii) surrender the property securing such claim to the

14

holder, § 1325(a)(5)(C).  Here, the secured creditors object to and, therefore, do not accept their proposed treatment under the respective plans.  Additionally, neither plan provides for surrender of the property securing the mortgage loans.  To be confirmed, only one option remains—the Plan must satisfy the conditions of § 1325(a)(5)(B), which allows a debtor to provide for the treatment of a secured claim over objection of the secured creditor if certain criteria set forth in subsections (i), (ii), and (iii) of § 1325(a)(5)(B) are met.

It is uncontroverted that each plan complies with § 1325(a)(5)(B)(i) because the secured creditors will retain the mortgages securing their respective claims.  Section 1325(a)(5)(B)(ii) provides that the value of any property to be distributed under the plan on account of the secured claim be not less than the allowed amount of the claim.  While Wilmington disputes that I can value the "prospect" of a sale for purposes of a plan's compliance with § 1325(a)(5)(B)(ii), *see* Wilmington Br. 5 (Case No. 19-40930, Dkt. No. 67), neither Wilmington nor BoA disputes that the respective plans propose to pay its secured claim in full with all contractual interest, *see* 11 U.S.C. § 1325(a)(5)(B)(ii) (providing that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such [allowed secured] claim is not less than the allowed amount of such claim."); 11 U.S.C. § 1322(e) (providing that "[n]otwithstanding subsection (b)(2) of this section and sections 506(b) and 1325(a)(5) of this title, if it is proposed in a plan to cure a default, the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law" and clarifying no interest upon interest due with respect to cure payments, narrowing Supreme Court's holding in *Rake v. Wade*, 508 U.S. at 473).  While the prospect of a sale may be an issue with respect to other confirmation requirements, such as a plan's feasibility under § 1325(a)(6), providing for payment of a secured claim through a sale does not violate § 1325(a)(5)(B)(ii), *per se*.

15

The parties disagree as to whether and how subsection (iii)(I) of § 1325(a)(5)(B) applies where payment of a secured claim is treated by providing for certain continuing payments followed by a sale of the creditor's collateral and payment in full of the secured claim from proceeds of the sale (both prepetition arrears and the balance due on the mortgage note at the time of the payoff).[16]   Section 1325(a)(5)(B)(iii) provides "*if*—(I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts."  11 U.S.C. § 1325(a)(5)(B)(iii) (emphasis added).  Congress added the equal payments provision as part of BAPCPA.  The legislative history is not clear with respect to its intent and courts have viewed the intent of the amendment differently.  Some courts prohibiting balloon payments have noted that the provision was added "in response to creditors' concerns about balloon and quarterly payments . . . . The equal payment provision prevents debtors from back loading payments to secured creditors or paying them other than on a monthly basis."  *In re Hamilton*, 401 B.R. at 543 (citations omitted).  Other courts have been critical of that view.  *See, e.g., In re Olsen*, 604 B.R. 790, 803 (Bankr. W.D. Wis. 2019) (observing "[c]ourts have struggled to find primary sources detailing the legislative purpose behind section 1325(a)(5)(B)(iii)(I)") (citations omitted)).   As one court adopting a contrary view has explained,

> Upon the Court's review, cases prohibiting balloon payments as contrary to the history or purpose of § 1325(a)(5)(B)(iii)(I) do so based on unsupported judicial speculation, rather than formal legislative history[.]
>
>  . . .

---

[16] It is clear that § 1325(a)(5)(B)(iii)(II) is not applicable as it applies only to personal property. 11 U.S.C. § 1325(a)(5)(B)(iii)(II). Courts have rejected that subsection (iii)(I) should similarly be construed as only applying to personal property. *See, e.g., In re Lemieux*, 347 B.R. 460, 465 (Bankr. D. Mass. 2006) (rejecting the argument that the court should construe the language used in § 1325(a)(5)(B)(iii)(I) to pertain to personal property only, and not real property, because of the explicit reference to personal property in § 1325(a)(5)(B)(iii)(II), citing to the fact that word "if" precedes both subsection (I) and (II), which are thus independent of one another).

This lack of cited authority is not surprising, as the only formal legislative history found by this Court . . . merely echoes the wording of the subsection, without any insight as to the purpose of its enactment.

. . .

[I]t seems that Congress intended to give creditors more certainty and regularity as to any proposed [sic] stream of payments. Requiring any stream of payments to be equal falls within the periodic payments language and functions in tandem with Congress's concerns over protecting holders of claims secured by personal property (as evident from § 1325(a)(5)(B)(iii)(II)). Accordingly, the Court determines that Congress had reasons other than prohibiting balloon payments in enacting the equal payment provision— reasons that fit more naturally with the language of the statute, and that are not implicated by the Debtor's Plan.

. . .

Moreover, the majority rule runs against the grain of Chapter 13's underlying purposes. "In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." . . . The interpretation argued by the [majority] would go against Congress's intent to provide a flexible means for the debtor to protect his assets, most importantly those assets necessary to pay his creditors by completing his plan, such as a house to live in or car to drive to work. This flexibility is evident in the structure of Chapter 13 itself. . . . This flexibility is further reflected in the legislative history.

*In re Cochran*, 555 B.R. at 901–02, 904-05 (internal citations omitted).

How does the equal payments provision of § 1325(a)(5)(B)(iii) apply, if at all, to plans, such as the ones at issue here, that provide for contractual maintenance payments or "adequate protection payments" to a secured creditor pending a sale or refinancing, where the monthly amount of the proposed periodic payments is not equal to the final payment that occurs upon sale or refinancing?  If the "payoff" on sale is viewed to be the last of a series of "periodic payments," the plans would violate the provisions of § 1325(a)(5)(B)(iii).  In determining which interpretation is more persuasive and whether the equal payments provision is applicable to these plans, I must consider other related provisions of the Code, including the subsections of § 1322

raised by Mr. Gnaman as also governing Wilmington's plan treatment and which Mr. Materne explicitly seeks to avoid being applied to his treatment of BoA's claims.

Section 1322, entitled "Contents of Plan," lists mandatory and optional provisions that a debtor may propose in a plan. *See* 11 U.S.C. §§ 1322(a)–(b). Under appropriate circumstances, a plan proposing sale of property may be consistent with the rights and powers of a debtor under § 1303 and the provisions of § 1322(b)(8), which states that that a plan may "provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor." 11 U.S.C. §§ 1322(b)(8), 1303; *see also* 8 Collier on Bankruptcy ¶ 1322.12 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("In keeping with the aim of increasing the flexibility of chapter 13 relief, section 1322(b)(8) permits the filing of a liquidating plan in a chapter 13 case."). But § 1322(b)(8) cannot be viewed in a vacuum, and for home mortgages where the last payment is due after the plan term (also referred to as "long-term" home mortgages), § 1322(b)(2)'s prohibition on modification of the rights of the holders of such claims must be considered.

Section 1322(b)(2) permits a debtor to modify the rights of a holder of a secured claim, but only if that claim is not "secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). "A [secured] creditor's rights 'protected from modification by § 1322(b)(2)' are the rights under the original loan instruments as defined by state law." *Dukes v. Suncoast Credit Union (In re Dukes)*, 909 F.3d 1306, 1321 (11th Cir. 2018) (quoting *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329–30 (1993)). A debtor may not "modify" the rights of a home-mortgage lender, subject only to the exceptions provided in subsections (b)(5) and (c). 11 U.S.C. § 1322(b)(2), (b)(5) and (c). Section § 1322(c) permits a debtor to cure defaults at any time during the term of the plan as long as cure is made prior to any foreclosure notwithstanding the anti-modification provision of § 1322(b)(2). Commonly in

18

Chapter 13 cases, a debtor will seek to preserve their home by proposing a plan that "cures" prepetition arrears over time while paying the remaining mortgage debt with interest in accordance with its terms or within the life of the plan. *See, e.g.*, Andriana Glover, *The "Cure" to the Homeowner's Bankruptcy Blues: An Analysis of A Homeowner's Ability to Cure His Mortgage Default Under S 1322(b)(5) of the Bankruptcy Code*, 34 Emory Bankr. Dev. J. 89, 91 (2017) (explaining "[a]mong the permissive provisions listed in § 1322(b), the Code provides that a debtor may cure any default. Most chapter 13 debtors rely on these provisions to save their homes.").

Section 1322(b) contains two other sections specifically dealing with cure of prepetition arrears and other defaults under Chapter 13 plans.

> Subsection 1322(b)(3) broadly permits [a chapter 13] plan to provide for the curing or waiving of any default and subsection (b)(5) permits the plan to provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

*In re Vertullo*, 610 B.R. 399, 406 (B.A.P. 1st Cir. 2020) (quotations and citations omitted). The primary difference between the subsections, is that § 1322(b)(3), when read in conjunction with § 1322(c)(2), permits a debtor to cure defaults of obligations that matured prepetition or that mature during the plan term—whereas § 1322(b)(5) deals exclusively with obligations where the last payment is due after the plan term.[17] *See, e.g., In re Redmond*, 380 B.R. 179, 188 (Bankr.

---

[17] Another difference not relevant to my determination is that (b)(3) also references "waiver" in addition to cure,  As one commentator has noted,

> [l]ittle has been written concerning the term 'waiving' of defaults found in Code § 1322(b)(3), as contrasted with the "curing" of defaults. It can be postulated that to cure a default means to remedy a failure to perform a duty, i.e., to restore to a condition of full compliance, whereas the "waiving" of a default would mean a breach of duty or failure to perform is forgiven or ignored.

7 Norton Bankr. L. & Prac. 3d § 149:8.

N.D. Ill. 2007); *In re Stevens*, 374 B.R. 31, 34–35 (Bankr. D.N.H. 2007) (applying Code §

1322(b)(3) for cure involving short term obligation).   Section 1322(c)(2) provides that, where

the last payment of a loan secured by a debtor's principal residence becomes due before the end

of the debtor's plan term, the plan may provide for payment of the claim over the term of the

plan— notwithstanding the anti-modification provision of § 1322(b)(2) and applicable non-

bankruptcy law.  It is not clear whether § 1322(b)(3), standing alone, was intended to allow an

option to cure a claim secured by a principal residence where the term of that loan is longer than

the plan term—but where the plan provides for early payment in full of that secured claim during

the plan term through a sale.  As will be discussed, the answer may ultimately be irrelevant to the

confirmation issues raised by these sale plans.

Sections 1322(b)(3) and (b)(5) must be considered in the context of the "anti-

modification" prohibition of subsection (b)(2) where a mortgage on the debtor's principal

residence is at issue.  *See Anderson*, 820 F.3d at 674 (holding that antimodification provision

under § 1322(b)(2) prevented reduction of default interest rate to pre-default rate under §§

1322(b)(3) and (5)); *but see In re Taddeo*, 685 F.2d at 27 (concluding that "the power to 'cure

any default' granted in [§] 1322(b)(3) and (b)(5) is not limited by the ban against 'modifying'

home mortgages in [§] 1322(b)(2) because we do not read 'curing defaults' under (b) (3) or

'curing defaults and maintaining payments' under (b)(5) to be modifications of claims"); 8

Collier on Bankruptcy ¶ 1322.07 (same, citing, among others, *In re Taddeo*, 685 F.2d 24 (2d Cir.

1982)).

While the general cure provision of § 1322(b)(3) is not explicitly limited to any particular

kind of debt, some courts have declined to permit application of § 1322(b)(3) to long-term

mortgage debt, reasoning that § 1322(b)(5) is a more specific subsection relating to the treatment of long-term home mortgage debt. *See United States v. Easley*, 216 B.R. 543, 546 (W.D. Va. 1997) (determining that "[i]n order to give effect to the limitations in § 1322(b)(5), § 1322(b)(3) cannot apply to such long-term mortgages). *But see*, Lundin on Chapter 13, § 78.4, at ¶ 17 (stating, without citation to decisional authority, that "[a]rguably, § 1322(b)(3) allows a Chapter 13 plan to cure or waive default with respect to any debt, including a long term debt, without satisfying the reasonable time or maintenance of payments requirements in § 1322(b)(5).").  If the secured debt at issue is a short-term debt that has matured or matures prior to the due date of the final plan payment, a debtor could not use § 1322(b)(5) to cure, but may look to § 1322(b)(3). *See generally*, 8 Collier on Bankruptcy, ¶ 1322.07 (noting "section 1322(b)(3) is applicable to all claims, including short-term debts such as . . . debts that are secured only by a security interest on the debtor's principal residence and that mature prior to the date on which the final plan payment is due. Any doubt with respect to the latter category should be eliminated by section 1322(c)(1)").[18]  On its face, there is overlap between § 1322(b)(3) and (b)(5) that raises questions as to how § 1322(b)(3) fits within the confirmation scheme for plan treatment of secured claims.[19]  While there is some support for holding that Congress may have intended §

---

[18]  Moreover, § 1322(c)(1) clarifies that: "[n]otwithstanding subsection (b)(2) and applicable nonbankruptcy law—(1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law." 11 U.S.C. § 1322(c)(1).

[19]  One court has suggested that "section 1322(c)(1), by its reference to section 1322(b)(3) and (5), usually applies to situations where the last payment of the secured claim on the original payment schedule is due after the date on which the final payment under a debtor's plan is due, i.e., *long term debt*." *In re Mendez*, 600 B.R. 321, 328 (Bankr. D.N.J. 2019).  By contrast, "section 1322(c)(2) expressly applies to secured claims *on which the last payment comes due prior to the last payment under a chapter 13 plan*. In looking to cure a default on a fully matured debt over a period of time, absent the consent of the creditor, a debtor does not have a choice, a debtor can only address a default under section 1322(b)(3) through section 1322(c)(2)."  *Id.* at 329.

21

1322(b)(3) to apply to cure of defaults for secured claims that had matured or were for a shorter

term than the plan period, leaving long-term home mortgage debt to be provided for as set forth

in § 1322(b)(5),[20] it is possible to read § 1322(b)(3) together with § 1322(c)(1) to permit a cure

of a long-term mortgage where a debtor proposes to pay the claim in full on an accelerated basis

within the plan term. Ultimately, in the context of a long-term home mortgage, whether cure

could be undertaken under § 1322(b)(3) or (b)(5) does not appear to matter because, if cure is

made pursuant to § 1322(b)(3), a debtor would not have the benefit of § 1322(c)(2) and would be

subject to the anti-modification provision of § 1322(b)(2).  Presumably, this would require a

debtor to make monthly payments in accordance with the terms of the mortgage during the term

of the plan, effectively maintaining payments as would otherwise be required by § 1322(b)(5).  If

the plan were to provide for periodic payments to avoid an impermissible modification under §

1322(b)(2), the equal payments provision under § 1325(a)(5)(B)(iii) would still have to be

addressed.

Section 1322(b)(5) states that, "notwithstanding" the anti-modification prohibition for

debt secured by a debtor's principal residence of § 1322(b)(2), a plan may "provide for the

curing of any default within a reasonable time and maintenance of payments while the case is

pending on any unsecured claim or secured claim on which the last payment is due after the date

on which the final payment under the plan is due . . . ."  11 U.S.C. § 1322(b)(5); *see also In re*

---

[20]  The legislative history regarding § 1322(b) appears to support this reading:

> Section 1322(b)(2) of the House amendment represents a compromise agreement
> between similar provisions in the House bill and Senate amendment. Under the House
> amendment, the plan may modify the rights of holders of secured claims other than a
> claim secured by a security interest in real property that is the debtor's principal
> residence. It is intended that a claim secured by the debtor's principal residence may
> be treated with under Section 1322(b)(5) of the House amendment. (emphasis added).

124 Cong. Rec. S. 17, 423 (1978).

*Nosek*, 544 F.3d at 45 (noting that "[n]otwithstanding the general exception set forth in §
1322(b)(2), which prevents the modification of a lender's rights secured by a debtor's primary
residence, § 1322(b)(5) explicitly 'authorizes debtors to cure any defaults on a long-term debt,
such as a mortgage, and to maintain payments on the debt during the life of the plan.'") (quoting
*Rake v. Wade*, 508 U.S. 464 (1993)).   Thus, § 1322(b)(5) allows for the curing of prepetition
arrears on long-term debt in default as of the petition date provided the debtor: "(1) cure[s] the
default *within a reasonable time* and (2) stay[s] current on postpetition payments due under the
parties' original agreement."[21]  *In re Euliano*, 442 B.R. 177, 186 (Bankr. D. Mass. 2010).   A
plan that does not provide for maintenance payments, and only provides for a sale within the
time period covered by plan that contemplates use of proceeds to pay off mortgage, would
impermissibly modify the secured creditor's rights.  *Compare Phila. Life Ins. Co. v. Proudfoot*

---

[21]  Some courts have concluded that § 1322(b)(5) is not implicated at all when long-term debt is paid
directly by the debtor where <u>no</u> cure of arrearages or other defaults is necessary or full amount of the
claim is being paid over the life of the plan.  *See, e.g., Matter of Chappell*, 984 F.2d 775, 781 (7th Cir.
1993) (determining, in the context of concluding that second mortgage debt not exempted from discharge
by operation of § 1328(a)(1), that debtor did not avail himself § 1322(b)(5) because debtor proposed
accelerating the second mortgage and paying it in full during the five years in which the plan was in
effect, suggesting that § 1322(b)(5) is only applicable where the full amount of the secured claim is not
paid during the case); *In re Rogers*, 494 B.R. 664, 669 (Bankr. M.D. Fla. 2013) ("§ 1322(b)(5) does not
except the debt forming the basis of [creditor]'s claim from discharge because the debtors' confirmed plan
did not contain a provision to cure prepetition arrears or default."); *Citizens Bank v. Cramer (In re
Cramer)*, 477 B.R. 736, 739–740 (Bankr. E.D. Wis. 2012) (concluding postconfirmation deficiency
judgment on travel trailer was dischargeable where plan provided for debtors to maintain on-going
payments directly but did not make specific reference to or provide for cure under § 1322(b)(5)); *In re
Starkey*, No. 15-00659, 2016 WL 3034738, at *1–2 (Bankr. D.D.C. May 18, 2016) (overruling
confirmation objection and concluding claim being paid directly in its entirety by debtor leaves claim
unaffected for purposes of § 1322(b)(2) because the creditor's claim is unaltered); *In re Kent*, No. BR 09-
35124-TMB13, 2016 WL 9488860, at *4 (Bankr. D. Or. Jan. 22, 2016) (holding that "for a claim under §
1322(b)(5), the plan must cure a default. Because there was no default, and therefore no cure, the
[m]ortgage was not provided for under § 1322(b)(5) and the exception to discharge enumerated in §
1328(a)(1) does not apply"); *but see In re Dukes*, No. 9:09-BK-02778-FMD, 2015 WL 3856335, at *5
(Bankr. M.D. Fla. June 19, 2015), *aff'd*, No. 2:15-CV-420-FTM-99, 2016 WL 5390948 (M.D. Fla. Sept.
27, 2016), *aff'd*, 909 F.3d 1306 (11th Cir. 2018) ("[W]hen [a] claim is 'long term debt' and the plan
proposes for the debtor to maintain payments, the claim is provided for under § 1322(b)(5) and excepted
from discharge under § 1328(a)(1).  This is the case . . . even if payments are current on the petition date
and there is no default to be cured.").

*(In re Proudfoot)*, 144 B.R. 876, 878 (B.A.P. 9th Cir. 1992) (holding that plan violated §
1322(b)(2) because "by withholding payments, the plan created defaults which modified
[secured creditor's] rights as a creditor whose only security was the Debtor's principal
residence"); *In re Gavia*, 24 B.R. 573, 575 (B.A.P. 9th Cir. 1982) (same; concluding that sale
plans that proposed to withhold current mortgage installments for up to six months to sell
debtors' residences and pay mortgages from sale proceeds created, rather than cured, default and
served to modify rights of creditors in violation of § 1322(b)(2)); *In re Newton*, 161 B.R. 207,
217 (Bankr. D. Minn. 1993) (holding that "obviously, any proposal to toll a debtor's obligation of
periodic debt service works a modification of the mortgagee's contractual rights in violation of §
1322(b)(2), whether the tolling is indefinite or for a fixed term.  More problematic are proposals
such as the one at bar, where a cure would be effected by joint means, one defined by periodic
cash payments but only partly efficacious, and the other contingent on a future market
transaction"); *with In re Dunn*, 399 B.R. 909 (Bankr. W.D. Wash. 2009) (notwithstanding
*Proudfoot* and *Gavia*, holding that proposed "sale" plan did not impermissibly modify rights of
secured creditor whose only security was an interest in debtor's residential real property because
although plan did not provide for current ongoing payments, plan provided for immediate stay
relief by stipulation or upon confirmation so that bank had the option to foreclose, therefore, in
effect, bank had the same rights under the plan that it would have had outside of bankruptcy).

While these debtors argue that the provisions of § 1322(b)(2) need not be considered
because each is simply "paying" the claim in full as permitted by § 1325(a)(5), it seems apparent
that Congress intended the anti-modification provisions of § 1322(b)(2) to prohibit the delay and
uncertainty that would be associated with sale plans, such as these, having no definite sale date
when cure will be made. Section 1322(b)(8) would certainly allow full payment of a secured
claim from proceeds of a sale on the effective date of a plan or, possibly, within a reasonable

time thereafter, but to interpret § 1322 and § 1325(b) to allow confirmation of a plan that

provides for an indefinite cure period within the plan term would essentially read the anti-

modification provision and other parameters established under § 1322(b) out of the Code.[22]

While "permissive" in the sense that § 1322(b) provides that a plan "may" include certain

provisions, reading the statutory scheme as a whole, considering the legislative intent and the

mandatory implication of the anti-modification provision of § 1322(b)(2), leads me to the

conclusion that, whether cure is achieved pursuant to § 1322(b)(3) or (b)(5), a plan providing for

treatment of a claim secured by a mortgage of a debtor's primary residence having a final

payment due after the plan period must provide for (i) cure within a reasonable time[23] and (ii)

periodic postpetition contractual payments to avoid an impermissible modification as prohibited

by § 1322(b)(2).  Again, this assumes that the plan does not provide for full payment of the

secured claim from proceeds of a sale on the effective date of a plan or within a reasonable time

thereafter.

    **B.**     **Does § 1325(a)(5)(B)(iii) apply to postpetition contractual "maintenance" payments?**

If a debtor is providing for payment of a long-term  home mortgage loan in a plan, the

Code would appear to require a debtor to comply with § 1325(a)(5)(B)(iii) where that plan that

proposes to maintain monthly contractual payments (or make other periodic payments) and to

---

[22] At least in a case that has not been previously converted, a debtor may dismiss a Chapter 13 case any time as a matter of right.  *See* 11 U.S.C. § 1307(b).  Because of that, the risk of non-performance under a sale plan after a delayed sale would be shouldered by the mortgagee and, to a lesser extent, other plan constituents who may be paid from the proceeds.

[23] Even if a debtor could propose to cure defaults on long-term debt under § 1322(b)(3), I would construe the Code to impose a reasonableness requirement as an element of good faith even where the statute does not use that term.

cure arrearages during the life of the plan.[24]  *Cf. Rake v. Wade*, 508 U.S. at 469, *superseded on*

*other grounds by statute*, Bankruptcy Reform Act of 1994, Pub. L. No. 103-394 § 305, 108 Stat.

4106–34 ("Section 1322(b)(5) expressly authorizes debtors to cure any defaults on a long-term

debt, such as a mortgage, and to maintain payments on the debt during the life of the plan. Under

§ 1322(b)(5), a plan may provide for the curing of any defaults and the maintenance of payments

on a long-term debt "notwithstanding" § 1322(b)(2)'s prohibition against modifications of the

rights of home mortgage lenders."); *In re McDonald*, 397 B.R. at 178 (sustaining confirmation

objection to plan which provided for change in payment amounts regarding cure proposal in later

months and holding that subsequent legislative amendment "did nothing to upset *Rake's*

determination that a cure proposal under § 1322(b)(5) . . . is a proposal to modify a secured claim

under a plan.  As such, it must meet the requirements of § 1325(a)(5)."); *In re Wagner*, 342 B.R.

766, 772 (Bankr. E.D. Tenn. 2006) (holding that long term maintenance payments pursuant §

---

[24]  Several commentators have noted that it would seem that a single payment from the proceeds of a sale
(and no other payments before that payment) would be permissible in a case where debt is secured by real
property, but the inclusion of monthly payments would prevent confirmation. *See generally* 8 Collier on
Bankruptcy ¶ 1325.06 ("Because section 1325(a)(5)(B)(iii)(I) only applies if the plan provides for
periodic payments, it also does not preclude a plan providing for a single lump sum payment to a creditor.
The requirement also does not apply to payments made to cure a default on a long term debt pursuant to
section 1322(b)(5) [citing only *In re Davis*, 343 B.R. 326, (Bankr. M.D. Fla. 2006), which held that the
enactment of § 1322(e) makes § 1325(a)(5) inapplicable to cure of long-term debt, for this proposition
(*see also infra*, at n.25 for further discussion of *Davis*)]. However, the provision does appear to preclude,
absent a creditor's acceptance, a plan that provides for a series of payments followed by a balloon
payment in a larger amount."); Lundin on Chapter 13, § 74.14, at ¶ 7 ("Not answered by [the cases
reading § 1325(a)(5)(B)(iii) to prohibit the use of balloon payments by sale where periodic payments are
also contemplated] is the question whether a pure refinance or balloon payment plan—one that does not
include periodic payments—would be subject to the equal monthly payment requirement in §
1325(a)(5)(B)(iii).  Such a plan would still have to satisfy the condition in § 1322(b)(5) that defaults be
cured within a 'reasonable time.' But both sections function without conflict when a plan cures arrearages
with a single payment within a reasonable time after confirmation.") The timing of the lump sum would
be critical in such a circumstance and would appear to be relatively limited to circumstances where sales
or refinancings were imminent.  These commentators do not address how a single lump-sum payment
plan would comply with the maintenance requirements of § 1322(b)(5) or the anti-modification of §
1322(b)(2) where the secured claim is a home mortgage with a final payment due after the plan term.
They may assume, without discussion, that maintenance payments are not "provided for by the plan" so
that those periodic payments would not trigger the equal payment provision of § 1325(a)(5)(B)(iii).

1322(b)(5) are still subject to the equal monthly payment requirement); *but see In re Davis*, 343 B.R. at 328 (allowing for cure of arrearages in unequal monthly installments because § 1325(a)(5) is inapplicable where claim is treated under § 1322(b)(5)); *In re Erickson*, 176 B.R. 753, 757 (Bankr. E.D. Pa. 1995) (in a case where the Chapter 13 trustee objected to confirmation based on feasibility, determining "[s]ale plans generally do not per se modify secured creditors' rights; they merely delay immediate payment to creditors in consideration for what is often accelerated full payment."); *In re Randell*, No. 21-25175-BEH, 2022 WL 174210, at *5 (Bankr. E.D. Wis. Jan. 19, 2022) (internal quotations and citation omitted) (determining that "nothing in § 1322(e) abrogated *Rake's* holding that mortgage arrearages paid off under the terms of the plan are an element of an allowed secured claim provided for by the plan and must meet the requirements of section 1325(a)(5)").  In *Rake*, each of the debtor's plans in the separate cases at issue proposed to pay all postpetition contractual mortgage payments directly to the creditor and to cure the prepetition mortgage arrearages, without interest, over the term of the plan. *Rake v. Wade*, 508 U.S. at 472.  The oversecured mortgage creditor objected to confirmation claiming it was entitled to postpetition interest on the arrearages, when the contract did not provide for additional interest.  *Id*.  Because the plans "provided for" the creditor's claim by establishing repayment terms for the arrearages as permitted by § 1322(b)(5), the Supreme Court ruled that the creditor was entitled to interest to satisfy the "present value requirement" of § 1322(b)(5)(5)(B)(ii).[25]  *Id*. at 473 (later abrogated as to the interest issue by enactment of §

---

[25]  I disagree with the conclusion of *Davis* that *Rake* has been entirely superseded by § 1322(e) regarding its application of § 1325(a)(5).  *See In re Davis*, 343 B.R. at 328.  I agree with other courts that have not followed *Davis* because § 1322(e) only addressed the amount necessary for cure, not the applicability of § 1325(a)(5)(B), and that "nothing in section 1322(b)(5), 1322(e) or 1325(a)(5)(B) indicates that section 1325(a)(5)(B) does not apply to the cure and maintenance of a secured claim through a plan other than on the issue of the amount necessary for cure." *In re Miceli*, 587 B.R. 492, 503 (Bankr. N.D. Ill. 2018); *see also In re Hamilton*, 401 B.R. 539 (1st Cir. BAP 2009); *In re Spark*, 509 B.R. 728 (Bankr. M.D. Fla. 2014). As will be discussed, *Rake* has been distinguished for other reasons by other courts.

1322(b)(e)).  In reaching its holding, the Supreme Court considered § 1328(a), which also

contains the phrase "provided for by the plan," and noted:

> As used in § 1328(a), that phrase is commonly understood to mean that a plan
> 'makes a provision' for, 'deals with,' or even 'refers to' a claim. [Citation
> omitted]. In addition, § 1328(a) unmistakably contemplates that a plan
> 'provides for' a claim when the plan cures a default and allows for the
> maintenance of regular payments on that claim, as authorized by § 1322(b)(5).
> Section 1328(a) states that 'all debts provided for by the plan' are
> dischargeable, and then lists three exceptions. One type of claim that is
> 'provided for by the plan' yet excepted from discharge under § 1328(a) is a
> claim 'provided for under section 1322(b)(5) of this title.' § 1328(a)(1). If
> claims that are subject to § 1322(b)(5) were not 'provided for by the plan,'
> there would be no reason to make an exception for them in § 1328(a)(1).

*Id*. at 474–75.

Some courts have distinguished *Rake* in other contexts and others have come to a

different conclusion as to whether maintenance payments are "provided for under the plan."  *See,*

*e.g., Cohen v. Lopez (In re Lopez),* 372 B.R. 40, 49–50 (B.A.P. 9th Cir. 2007), *aff'd and opinion*

*adopted,* 550 F.3d 1202 (9th Cir. 2008) (holding, in the context of a Chapter 13 trustee's

objection to maintenance payments being made directly to a lender outside the plan, that regular,

postpetition maintenance payments are in amounts no different from what the debtor would have

paid had he or she never defaulted and are not modified by the Chapter 13 bankruptcy and not

provided for by the plan);  *In re Bullard*, 475 B.R. 304, 308–309 (Bankr. D. Mass. 2012), *aff'd*,

494 B.R. 92 (B.A.P. 1st Cir. 2013) (in the context of a hybrid plan appearing to involve multi-

unit property in which one of the units is the debtor's principal residence and with respect to

which the creditor did not object to bifurcation based on the nature of the property, concluding

that under § 1322(b)(5) that "a debtor may pay a prepetition arrearage in full through the plan

and, upon plan completion, the default is deemed cured and the relationship between the parties

continues . . . [;] the secured claim is simply riding through the bankruptcy on its original terms,

it is not a 'secured claim provided for by the plan' and is not subject to the present value

requirement of 11 U.S.C. § 1325(a)(5)(B)(ii)"); *In re Clay*, 339 B.R. 784, 785-86, 787, 788

(Bankr. D. Utah 2006) (determining in the context of an objection to confirmation by the Chapter

13 Trustee to a plan where the debtor had only secured debt and proposed to make cure

payments on home mortgages through the plan and all other payments directly to secured

creditors that BAPCPA did not change the right of Chapter 13 debtors to choose to pay secured

creditors directly so long as the contract rights of those creditors are not altered. The requirement

in § 1325(a)(5) that equal monthly payments be made to allowed secured claims provided for by

§ 1325(a)(5) does not change the pre-BAPCPA result because "a secured claim is only 'provided

for by the plan,' and thus subject to the requirements of § 1325(a)(5), if the creditor is not paid

pursuant to the terms of the contract."). *See also In re Dukes*, 909 F.3d  at 1315 (in case

analyzing "provided for language" in the context of discharge injunction application and

concluding that "*Rake* does not stand for the proposition that a plan 'provides for' a claim merely

by mentioning it. To the contrary, it suggests that a claim is 'provided for' where the plan

supplies terms that will govern the repayment of the claim").

In *Lopez*, the Bankruptcy Appellate Panel for the Ninth Circuit addressed the "provided

for" language in the context of determining whether direct payments could be made to a home

mortgage lender and ruled that "[w]hile this is a difficult issue, with arguments on both sides,

this panel nevertheless concludes that the ongoing maintenance payments are not modified by

the Chapter 13 bankruptcy."  *In re Lopez*, 372 B.R. at 50. The court was persuaded by the

following passage in *Rake* as supporting its conclusion: "'[a]s authorized by § 1322(b)(5), the

plans essentially split each of respondent's secured claims into two separate claims—the

underlying debt and the arrearages.  While payments of principal and interest on the underlying

debts were simply 'maintained' according to the terms of the mortgage documents during the

pendency of petitioners' cases, each plan treated the arrearages as a distinct claim to be paid off

29

within the life of the plan pursuant to repayment schedules established by the plans.'" *Id.* at 48–

49 (quoting *Rake,* 508 U.S. at 473).  Based on that language, the court in *Lopez* reasoned that:

> …Rake assumed that the entire home mortgage claim was comprised of two
> separate parts. First, there is the amount in arrears. This amount consists of
> prepetition obligations due but not paid—that is, the claims are "mature"—as
> of the filing. Second, there is the regular, ongoing post-petition maintenance
> payments, in amounts no different from what the debtor would have paid had
> he or she never defaulted. These consist of obligations under the relevant
> documents that, but for any pre-petition acceleration of maturity, would be
> unmatured as of the filing. Thus, bankruptcy law and the plan only modify the
> claim in relation to the scheduled payments in default at filing. Post-petition
> payments are different; they are ongoing payments, not due at filing, which
> will continue to be made after plan completion. They are not altered by the
> plan.

*In re Lopez*, 372 B.R. at 48–49.  The *Lopez* court concluded any statements that could be read to

classify maintenance payments as being "provided for" by a plan in *Rake* should be viewed as

distinguishable *dicta* since the focus in that case was the treatment of payments necessary to cure

arrears and there was other language in *Rake* "contradict[ing] the unitary view of home mortgage

claims."  *Id*. at 48.[26]

    "The Bankruptcy Code does not define 'maintenance of payments,' but courts have

interpreted this provision to mean the original contractual payments of principal and interest over

---

[26]  While not referenced in *Lopez*, that court's interpretation of "provided for" in § 1325(a)(5) might also
resolve the question of how the equal payments requirement of § 1325(a)(5)(B)(iii) could apply to
"maintenance" payments where the allowed secured claim is based on an adjustable-rate home mortgage
where, contractually, the amount of monthly payments will likely change during the term of the plan.  By
viewing maintenance payments made directly by debtors as not provided for by the plan, a court would
not apply the equal payments provision to those payments.  This would not resolve the question in so-
called "conduit" districts where all payments to mortgage holders are disbursed by the Chapter 13 trustee,
as opposed to districts in which the debtor makes ongoing mortgage payments directly to the mortgagee.
*See, e.g.,* Gordon Bermant & Jean Braucher, *Making Post-Petition Mortgage Payments Inside Chapter 13
Plans: Facts, Law, Policy*, 80 Am. Bankr. L.J. 261, 261 (2006) (describing disbursements of ongoing,
postpetition mortgage payments by trustees as "conduit payments").  I have not located any published
decisions where courts have addressed this apparent "anomaly" in the statute.

the time frame specified in the note."[27] *In re Bullard*, 475 B.R. at 308–09.  While well-reasoned

arguments can be made for a "bifurcated-claim approach" such as was adopted by the *Lopez*

court, the language of § 1322(b)(5) and the language of *Rake* militate against that interpretation.

Section 1322(b)(5) applies to "each allowed secured claim provided for by the plan" and

provides requirements for confirmation of a plan.  Secured claims are not "allowed" in two parts.

Debts are owed under a mortgage note that may include both arrearages and principal amounts

that may not yet be due as acknowledged in *Rake*.  The *Lopez* court observes that the Code

allows a debtor to bifurcate claims into secured and unsecured claims where the value of the

collateral is less than the amount of the claim.  *See* 11 U.S.C. § 506(a).  But where a fully-

secured claim is "bifurcated" by the Code for purposes of plan treatment into arrears that may be

cured and the balance of the claim that will be maintained, the underlying nature of the allowed

secured claim is not altered.  Compare 11 U.S.C. § 506(a)(where portions of the amount of

secured claims may be determined not to be secured so as to be determined to be general

unsecured claims).  The entirety of a debt that is fully secured constitutes the "allowed secured

claim," and a plan that does more than state that the rights of the holder of that secured claim are

not affected in any way by the plan "provides for" the treatment of that claim.  For example, by

implementing the cure provisions of § 1322(b)(3), (b)(5), or (c), a plan provides for treatment of

a component of that claim.  Other subsections of § 1325(a)(5) appear to assume that the section

applies to the entire allowed amount of the secured claim.  *See* 11 U.S.C. § 1325(a)(5)(A)

(referring to acceptance by the holder of "such claim"), 1325(a)(5)(B)(i) (referring to the holder

---

[27]  While I address "maintenance payments" in the context of § 1322(b)(5), as discussed above, a plan
providing for a purported cure under § 1322(b)(2) of an unmatured home mortgage would have to provide
for similar contractual payments to avoid running afoul of the anti-modification provision of §
1322(b)(2).

of such claim when requiring lien retention and referring to payment of the "underlying debt"),

1325(a)(5)(B)(ii) (requiring that a plan distribute at least the present value of the "allowed

amount of such claim" "on account of such claim"), and 1325(a)(5)(C) (addressing surrender of

the property securing such claim).  Finally, it is not likely that Congress intended  that §

1325(a)(5) be interpreted to apply to maintenance payments made "through the plan" in districts

where such conduit plans are required, but not to apply to maintenance payments made in

districts that allowed direct payments by debtors.  As such, I conclude that a plan proposing to

cure arrearages and maintain payments pursuant to § 1322(b)(5) "provide[s] for" treatment of

such a claim, making satisfaction of § 1325(a)(5) a requirement of confirmation.  *Cf. Rake*, 508

U.S. at 474 (interpreting § 1325(a)(5) in the context of other provisions in the Code); *In re

Melillo*, 385 B.R. 476, 481 (Bankr. D. Mass. 2008) (holding that "[§] 1325(a)(5)(B)(iii)(I) does

not preclude the curing of a default within a reasonable time or the maintenance of payments on

a long term debt as it only controls the manner in which payments are made" and concluding §

"1322(b)(5) just means that the entire secured claim need not be paid in full under certain

circumstances allowing cure of default, but the claim is still an allowed secured claim.")

(quotations and citations omitted)), *vacated on other grounds, sub nom.*, *In re Flynn*, 402 B.R.

437 (B.A.P. 1st Cir. 2009);  *In re Schultz*, 363 B.R. 902, 906 (Bankr. E.D. Wis. 2007) (holding

that "periodic payments must be equal, period. This applies when the default is cured and only

current payments and the arrearage are being paid pursuant to the plan pursuant to 11 U.S.C. §

1322(b)(5) and when a long-term or matured debt are paid in full under the plan").  While the

interpretation of § 1325(a)(5) adopted by *Lopez* would provide courts welcome flexibility in

addressing confirmation of Chapter 13 plans, I feel constrained by the language of that provision

and the dicta in *Rake* to conclude that § 1325(a)(5)(B)(iii) would apply to periodic maintenance

payments and any cure payments for which a plan provides.

### C. Does § 1325(a)(5)(B)(iii) preclude lump-sum payoffs upon the sale of a principal residence?

I now return to the question of whether the plans may include a lump sum cure and payoff where they provide for periodic payments to be paid directly by Mr. Gnaman or "adequate protection payments" to be disbursed by the Chapter 13 Trustee from plan payments made by Mr. Materne.

First, the Bankruptcy Code does not expressly contemplate post-confirmation adequate protection payments as part of a plan. Section 361 provides the means by which adequate protection may be provided when required by § 362, 363, or 364. Those provisions address circumstances when a secured creditor may be entitled to adequate protection from diminution of the value of its collateral during the pendency of a bankruptcy case. By providing adequate protection, a debtor may avoid relief from the automatic stay; use, lease or sell collateral; or obtain approval of priming liens. Neither § 1322(b) nor § 1325(a)(5) mention adequate protection or provide that adequate protection payments may be an alternative for the treatment of secured claims provided by those sections for confirmation of a plan.[28] As such, for purposes of analysis, I view the adequate protection payments proposed by Mr. Materne as a form of periodic payment provided for by the plan on account of the secured claim of BoA. *See, e.g., In re Hamilton*, 401 B.R. at 543 (in response to the debtor's argument that his proposed balloon payment under his plan meant that the plan did not provide for "periodic payments" that would dictate application of § 1325(a)(5)(B), the First Circuit Bankruptcy Appellate Panel ("BAP")

---

[28] Mr. Materne argues that § 1322(b)(11) (providing that "a plan may include any other appropriate provision not inconsistent with this title") may be the basis for his plan provision paying adequate protection. In other circumstances, it may be appropriate for a plan to provide for adequate protection payments to a secured lender, but naming periodic payments "adequate protection payments" does not eliminate a debtor's obligations not to modify a home mortgage or to comply with more specific provisions of § 1322(b) nor § 1325(a)(5).

rejected the debtor's argument, stating that "[t]he [d]ebtor's argument is an invitation for the

Panel to elevate form over substance by allowing the Debtor to sidestep statutory requirements

by attaching a label to his plan payments other than the one that actually applies.  We must

decline the invitation."); *In re Acosta*, No. 08–11411, 2009 WL 2849096, at *3 (Bankr. N.D. Cal.

May 7, 2009) ("The debtors' plan calls for monthly interest-only payments for four or five years,

with a balloon at the end. Their argument is that the interest payments are 'adequate protection

payments' and not 'periodic payments.' The court declines their invitation to engage in this

sophistry; payments are payments."); *In re Luckett*, No. 07–24706–SVK, 2007 WL 3125278, at

*1 (Bankr. E.D. Wis. Oct. 24, 2007) (determining that adequate protection payments are property

distributed to a secured creditor and must be in equal monthly amounts, concluding that

"[c]alling the property distributed on the claim 'adequate protection payments' does not change

the fact that this is property distributed on the claim. If made over time, the distributions of the

property on the claim must be in equal monthly amounts, and, unless [the creditor] consents, the

balloon payment at the end of the Plan will not satisfy this requirement."); *but see In re Cochran*,

555 B.R. at 897 (noting "[s]ome courts seem to suggest that adequate protection payments, even

though regularly occurring, may not qualify as 'periodic payments' under §

1325(a)(5)(B)(iii)(I)"); *In re Bollinger*, No. BR 10–62344, 2011 WL 3882275, at *4 n. 12

(Bankr. D. Or. Sept. 2, 2011) (stating "11 U.S.C. § 1325(a)(5)(B)(iii)(I) does not, of course,

prohibit a single payment in full at any time during the course of the plan, assuming all other

elements of §§ 1325 and 1322 have been complied with. Where the collateral is real property

adequate protection payments appropriate under § 361 maybe [sic] addressed in a plan or

separately.").  Consequently, both the Materne plan and the Gnaman plan propose to make

periodic payments (although "in" the plan in the case of Materne and directly by Gnaman) and

cure with a lump sum payment that will also pay the secured claim in full.

34

Having considered the various provisions of § 1322 and having determined that each of the debtor's plans must satisfy the requirements of § 1325(a)(5)(B)(iii)(I) because they each include periodic payments, it is necessary to determine whether the plans comply with the "equal payments" requirement of that provision.  There are majority and minority interpretations of whether balloon payments are prohibited under § 1325(a)(5)(B)(iii)(I).

> The majority holds this subsection prohibits balloon payments. *See, e.g., In re Miceli*, 587 B.R. 492, 502 n.13 (Bankr. N.D. Ill. 2018) (noting the "nearly universal line of cases which ha[ve] held that the subsection prohibits balloon payments"). These cases argue a balloon payment is part of the stream of periodic payments. It follows that the monthly payments and eventual balloon payment are periodic payments not in "equal monthly amounts." . . .  A growing minority view interprets the "periodic payments" language differently.

*In re Olsen*, 604 B.R. at 803 (in case were modification was permissible under § 1322 because mortgage claim part of commercial transaction, applying § 1325 as qualifying the requirements of § 1322 and holding that a balloon payment does not violate § 1325(a)(5)(B)(iii));  *In re Cochran*, 555 B.R. at 906 (declining to follow the majority rule in case not involving exception to modification and holding that "balloon payments are not 'periodic payments' proscribed by § 1325(a)(5)(B)(iii)(I)"); *see also* Keith M. Lundin, Lundin on Chapter 13, § 74.14, at ¶ 7 ("At present, a majority of reported decisions reads the equal monthly amount requirement in § 1325(a)(5)(B)(iii) to prohibit the use of balloon payments by sale or refinancing to manage the curing of mortgage arrearages when periodic payments are also contemplated by the plan.").

The BAP has followed the majority view and has ruled that a "balloon payment" at the end of a 60-month plan violated § 1325(a)(5)(B)(iii).  *In re Hamilton*, 401 B.R. at 541, 545–46. In that case, the proposed plan provided for bifurcation of a secured creditor's claim, monthly plan payments to the chapter 13 trustee in the amount of $5,397 that would result in distributions of $4,029.77 per month on account of the secured portion of the claim (which was less than the monthly payment required to pay the modified claim in 60 months), and a balloon payment "[i]n

or before the 60th month" through a refinancing.  *Id*.  After dispensing with the debtor's

arguments that the plan specifically provided that payments were not to be considered "periodic

payments" and that discretionary payment provisions in the plan made § 1325(a)(5)(B)(iii)

inapplicable, the BAP held that the debtor's plan provided for "periodic payments" and that "11

U.S.C. § 1325(a)(5)(B)(iii)(I) prohibits balloon payments on secured claims where the creditor

has not accepted the plan and the debtor has not surrendered the property."  *Id*. at 541 (also

noting that "[o]verwhelmingly, courts have held that by its very terms, a balloon payment is not

equal to the payment that preceded it, and thus violates § 1325(a)(5)(B)(iii)(I) with respect to

periodic payments on a secured claim under a chapter 13 plan").

　　　Courts adopting the minority interpretation have held that, where applicable, §

1325(a)(5)(B)(iii) does not prohibit a balloon payment and have interpreted "periodic payments"

to refer only to those payments and not a balloon payment that would pay off the loan.  As

discussed by one such court,

> Because "periodic" payments are regularly reoccurring and balloon payments are not,
> balloon payments are not "property to be distributed ... in the form of periodic payments"
> and, consequently, are outside the scope of § 1325(a)(5)(B)(iii)(I). This conforms with
> the common and technical understanding of these terms. For example, *Webster's Third
> New International Dictionary* defines "periodic" as something that is "characterized by
> periods," occurs "at regular intervals," and occurs "repeatedly from time to time." ...
> These definitions establish that a final, balloon payment is distinct and separate from the
> preceding "periodic payments." Accordingly, it is only the periodic payments—and not
> the balloon payment—that are subject to the "equal monthly amounts" directive of §
> 1325(a)(5)(B)(iii)(I).
>
> The language of § 1325(a)(5)(B) indicates that the property distributed on account of a
> claim need not be of a singular type and need not be made in a singular manner.
> Importantly, § 1325(a)(5)(B)(iii) does not include a definite article, such as 'the.' For
> example, the related, immediately preceding provision—§ 1325(a)(5)(B)(ii)—refers to
> 'the value, as of the effective date of the plan, of property,' indicating that there is only
> one value, but allowing for numerous articles 'of property.' Section 1325(a)(5)(B)(iii)
> does not state 'if the property to be distributed pursuant to this subsection;' rather, it
> states 'if property.'

*In re Cochran*, 555 B.R. at 898–99.

In Gnaman, the debtor argues that the plan effectively "bifurcates" Wilmington's secured claim into the pre-petition arrearages to be cured on sale of the Property and the remaining balance as to which the contractual payments will be maintained and the balance of the secured claim will be paid from proceeds of the contemplated sale of the Franklin Property.  As discussed above, the Gnaman plan proposes to cure the prepetition mortgage arrears by a single payment upon the sale of the Franklin Property.  As to the "non-cure" portion of Wilmington's secured claim, Mr. Gnaman proposes to "maintain" by making periodic contractual payments as required by § 1322(b)(5) in even amounts as contemplated by § 1322(b)(5), but the Debtor also proposes a "balloon" payment upon sale.  The Code specifically contemplates that a debtor may sell property during the pendency of the case.  *See* 11 U.S.C. §§ 363, 1303, and 1322(b)(8).  Notably, under the terms of standard mortgages and applicable non-bankruptcy law, a mortgagor would be permitted to sell mortgaged residential property at any time prior to a foreclosure provided that all amounts due under the mortgage were paid at the time of the sale.

It is difficult to conceive that Congress would have intended to prohibit confirmation of a plan that proposed to maintain contractual mortgage payments, cure arrears, and pay off the full amount of the secured claim in a reasonable period of time upon the sale of a property in which the mortgagee enjoys an equity cushion where the debtor demonstrates a good faith reason for delaying the sale.[29]  Yet, as discussed above, a majority of courts that have considered this issue have concluded that the equal payment provision of §1325(a)(5)(B)(iii)(I) would operate to prohibit confirmation of such a plan.  *See, e.g., Hamilton*, 401 B.R. at 544; *In re Benedicto*, 587 B.R. at 576; *In re Miceli*, 587 B.R. at 502 n.13.  By adopting a strict literal interpretation of the

---

[29]  It is also difficult to conceive a debtor who in good faith wishes to cure a significant prepetition arrears through a sale, rather than just buy time through a plan that may not be consummated, would not endeavor to take deliberate steps to sell the property.

equal payment provision added to the Code by BAPCPA, courts avoid an inevitable large volume of evidentiary hearings on the issues of feasibility of distant future sales (or refinancings), "reasonableness of the timing of a cure," and the good faith of the debtor proposing delayed treatment.  Plans like those proposed by Messrs. Gnaman and Materne illustrate certain possibilities for those evidentiary issues where those plans provide no timetable for a sale, details about a sale process, or information about why the unspecified time to cure is "reasonable."

The Code does provide some flexibility for plans to cure and satisfy allowed secured claims through a sale that might allow confirmation of a plan similar to the hypothetical plan discussed above.  I interpret § 1322(b)(8) and § 1325(a)(5) to permit a secured claim to be paid in full through a sale that is in prospect at the time of confirmation or a reasonable time thereafter, subject to all other confirmation requirements such as feasibility and good faith.[30] Moreover, a debtor may sell his or her principal residence during the life of a traditional "cure and maintain" plan and pay the secured claim in full from proceeds of that sale.  Admittedly,

---

[30]  Notably, Wilmington does not take the position that sale plans are per se unconfirmable where a secured creditor does not accept the plan, stating:

> If unable to obtain the assent of the affected secured creditor, a Chapter 13 debtor must walk a fine line of putting forth a plan which both satisfies the requirements of §1325(a)(5) while, at the same time, being able to show that the creditor at issue is adequately protected during the limited and clearly defined sale term of the plan. For example, if a debtor proposed a sale plan which indicated that the property at issue would be sold within a six month time frame, provided that the property had sufficient equity, it would seem that the creditor would not be entitled to relief from the automatic stay during this time frame. For that reason, the debtor would presumably need not propose payments to the creditor during such sale period. As such, the Debtor would not be burdened with the task of satisfying the "equal monthly amounts" provision of §1325(a)(5)(B)(iii)(I) as the plan would not contemplate "periodic payments."

Wilmington Br. 6. (Case No. 19-40930, Dkt. No. 67).

where confirmation of a plan is denied because a secured creditor has objected because there is

no specific sale process contemplated, such an interpretation does not assist a debtor who cannot

afford to propose a "cure and maintain" plan, but wishes to rely on the perceived equity in his or

her home until a sale at some undefined time during the plan period cures defaults and pays the

secured claim in full.

The minority position is appealing and could be said to give life to both § 1322(b)(5),

which contemplates curing of defaults within a "reasonable" time while maintaining contractual

or adequate protection payments, and § 1322(a)(8), which contemplates that a plan may provide

for the payment of all or a part of a claim from property of the estate.  *See, e.g., In re Cochran*,

555 B.R. at 898–99 (concluding balloon payment are not a "periodic payment" under the plain

language of § 1325(a)(5)(B)(iii)(I)); Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel, &

Adam M. Goodman, Chapter 13 Practice & Procedure § 5:18 (2016) ("The term 'periodic

payments' could be construed to mean regular, recurring payments that are made to reduce a

secured claim during the plan's term but not to a final one that completely satisfies it. A regular

installment payment or payment of interest on the debt is a 'periodic' one, whereas a lump sum

payment is not . . . . [T]his interpretation of 'periodic payments' accomplishes the primary

objective of the new provisions of Code § 1325(a)(5)(B)(iii) . . . ."; Lynn M. LoPucki, *House

Swaps: A Strategic Bankruptcy Solution to the Foreclosure Crisis*, 112 Mich. L. Rev. 689, 729–

33 (2014) ("Had the drafters ... intended [section 1325(a)(5)(B)(iii)(I)] to prohibit balloon

payments and periodic payments, the drafters would have said 'all plan payments' instead of

'such payments.'").  Unfortunately, the majority interpretation is most consistent with the

language of § 1325(a)(5)(B)(iii), the smattering of legislative intent to spare holders of secured

claims from uneven payments and indefinite balloon payments,  consistent administration of

Chapter 13 cases, and persuasive authority in this Circuit.  While not entirely satisfactory, in the

absence of clarification by Congress, I have determined that the equal payment provision of § 1325(a)(5)(B)(iii) is best read to prohibit confirmation of a sale plan, over the objection of a secured creditor holding a mortgage of a principal residence, that contemplates periodic payments followed by a lump-sum payment.

### D.   Another path:  §§ 1322(b)(8) and 1325(a)(5)

Each of the debtors argues that payment of a secured claim in full through a sale is consistent with § 1322(b)(8) and § 1325(a)(5).  That may be correct as the Code would certainly permit confirmation of a sale plan that proposes payment in full of an allowed claim secured by a home mortgage at the time of confirmation and possibly with some delay.  Should either debtor elect to propose a non-consensual plan that provides for cure and payment of allowed claims secured by long-term mortgages through a sale of residential property that does not satisfy the cure and maintain option provided by § 1322(b)(5) or the cure and "no modification" option contemplated by § 1322(b)(5) and (c)(1), the statutory path to confirmation could be through § 1322(b)(8) and § 1325(a)(5).  These provisions may permit confirmation of a non-consensual plan that provides for a secured claim to be paid in full through a sale that is in prospect at the time of or at a reasonable time after confirmation, with or without payments prior to the sale, subject to all other confirmation requirements such as feasibility and good faith.

If the plans were to be amended to provide for a sale that is in prospect at the time of or at a reasonable time after confirmation, all statutory confirmation requirements must be met, and each debtor would have to demonstrate the reasonableness of the proposed timing for the sale and payment of the claim, feasibility, and good faith.  Section 1325(a)(6) requires that "the debtor will be able to make all payments under the plan and to comply with the plan," 11 U.S.C. § 1325(a)(6), and a plan must be proposed in good faith to be confirmed, 11 U.S.C. § 1325(a)(3).

40

Evidence that would support these determinations is likely to overlap and courts sometimes discuss these requirements together.

In determining whether confirmation of a debtor's sale plan is appropriate, some courts have focused on the feasibility requirement in the context of determining the "reasonableness" of a proposed cure period and have required that sale plans identify, with sufficient specificity, the terms of the sale, including the listing price and terms, a timeline for the proposed sale, and a default remedy or other alternative if the sale fails to close within the proposed time frame. *See In re Weltlich*, No. 12-30181, 2012 WL 3782553 (Bankr. N.D. Ohio Aug. 31, 2012) (determining sale plan was reasonable and feasible effort, following listing of property for sale); *In re Erickson*, 176 B.R. at 758 (denying confirmation because plan failed to provide any specifics of conditions or timing of sale); *In re Newton*, 161 B.R. at 218 (finding that court cannot confirm a plan unless specifics of condition and timing of the sale are provided). As one court explained:

> The plan should specify the terms under which the debtor proposes to market the property, including the listing price and the length and commencement date of the listing agreement. It also should incorporate a default remedy to relieve the affected mortgagee(s) from the automatic stay, if the sale does not close by the end of the proposed cure period. If an affected mortgagee objects to confirmation, the debtor must produce evidence as to past marketing efforts, the state of the market for the subject asset, current sale prospects, the existence and maintenance of any "equity cushion" in the property, and all other circumstances that bear on whether the creditor will see its way out of the case financially whole. If the debtor cannot produce anything more than remote speculation as to the terms or date of a sale; if market conditions are eroding the value of the collateral; if the debtor's efforts at a sale are not directed or energetic enough; or if any other factors demonstrate that the creditor will not receive the value of its secured rights within a circumscribed, specified, and "reasonable" cure period, the court cannot confirm the plan.

*In re Erickson*, 176 B.R. at 757–58. Courts typically focus on whether a plan that provides for a sale of property has the necessary specificity to show that the debtor will be able to make all payments contemplated under the plan in order to meet the feasibility requirement of §

1325(a)(6).  *See, e.g., In re Milano*, 2012 WL 1965661 (Bankr. N.D. Ohio, May 31, 2012)

(finding plan modification not feasible where there was a lack of specifics regarding the debtor's

proposed sale plan); *In re Lynch*, 2009 WL 1955748, *5 (Bankr. E.D.N.Y. July 6, 2009)

(denying confirmation because the debtor did not meet his burden to demonstrate feasibility of

plan under § 1325(a)(6) where the plan did not specify the property subject to sale, did not

project with sufficient certainty a timeframe or a date for a sale, and did not propose sale terms);

*In re Erickson*, 176 B.R. at 756 (denying confirmation where the debtors' proposed plan did not

specify terms of sale, when the sale was to be completed, or an alternative if the projected sale

was unsuccessful); *In re Newton*, 161 B.R. at 218 (denying confirmation regarding eighteen

month sale process and finding that debtors did not meet burden of demonstrating "the

reasonableness and feasibility of their cure proposal, whether as to the means for effectuating it

or as to the duration within which it is to be effected").  To meet the burden of demonstrating

feasibility, therefore, a debtor may need to provide evidence as to marketing efforts, the terms of

a sale, and generally show that the debtor is motivated to effectuate a sale process, as well as

disclosing any other factors which may impact payment of the allowed secured claim.  *Cf. In re

Erickson*, 176 B.R. at 757–58.  These requirements are not necessarily exhaustive, but are the

starting points in guiding the Court's analysis for whether a plan could be confirmed over a

creditor's objection and in determining feasibility of a plan.

A plan must also be proposed in good faith in order to be confirmed. 11 U.S.C. §

1325(a)(3).  The phrase "good faith" is undefined in the Code and "the legislative history

provides little insight into its meaning."  *Berliner v. Pappalardo (In re Puffer)*, 674 F.3d 78, 81

(1st Cir. 2012). The First Circuit has concluded that a "totality of the circumstances approach to

adjudicating good faith should apply . . . to inquiries under section 1325."  *Id.* at 82.  Although

the test "cannot be reduced to a mechanical checklist[,]" *id.*, courts have considered the

following circumstances when assessing whether a plan is proposed in good faith:

> (1) debtor's accuracy in stating her debts and expenses, (2) debtor's honesty in
> the bankruptcy process, including whether she has attempted to mislead the
> court and whether she has made any misrepresentations, (3) whether the
> Bankruptcy Code is being unfairly manipulated, (4) the type of debt sought to
> be discharged, (5) whether the debt would be dischargeable in a Chapter 7, and
> (6) debtor's motivation and sincerity in seeking Chapter 13 relief.

*Sullivan v. Solimini (In re Sullivan)*, 326 B.R. 204, 212 (B.A.P. 1st Cir. 2005).  Good faith is

ultimately "a concept, not a construct" that "derives from equity."  *In re Puffer*, 674 F.3d at 81.

Wilmington appears to seek a bad faith determination premised on Mr. Gnaman's filing of a plan

which requires a sale in order to be feasible.  BoA argues that Mr. Materne's failure to address

postpetition payments in a manner that would not increase postpetition arrears is bad faith.

While the proposal of a sale plan alone is insufficient to establish bad faith, *see, e.g., In re*

*Nardini*, No. 15-10244, 2015 WL 9438292, at *3 (Bankr. D. Vt. Dec. 23, 2015) (finding that

filing a plan reliant on loan modification does not rise to the level of bad faith), a sale plan

proposing sale periods that could run through the last month of the term of the plan,

unaccompanied by milestones related to actual efforts to sell, such as the hiring of a broker or the

listing of the property by a date certain, and, in Mr. Materne's case, the accrual of significant

postpetition arrears, may constitute circumstances from which a lack of good faith might be

inferred.  In each case, evidence of the reason for a delay in the sale process will weigh in the

determination of good faith.

**IV.    CONCLUSION**

Applying the rulings and principles above, I will enter orders sustaining the objections of

Wilmington and BoA to confirmation of the respective plans.  Mr. Gnaman's plan provides for a

lump-sum payment after periodic payments in contravention of § 1325(a)(5)(B)(iii) and does not

provide for a specific sale process that would pay Wilmington's allowed secured claim at or a reasonable time after confirmation.  As to Mr. Materne's plan, the debtor states that the proposed treatment of BoA's allowed secured claims is not intended to fit within with the provisions of § 1322(b)(3) or (b)(5).  Because the plan calls for payments that are less than the contractual amount due until a sale that is to occur at an unspecified time during the life of the plan, the plan proposes an impermissible modification of the rights of BoA under § 1322(b)(2).  In addition, the plan provides for a balloon payment in contravention of § 1325(a)(5)(B)(iii) and does not provide for a specific sale process that would pay BoA's allowed secured claims at or a reasonable time after confirmation.

As have other courts and commentators, I have struggled with the issues presented by the provisions of the Code governing treatment of claims secured by a home mortgage under a Chapter 13 plan.  In some instances, arguments on each side of an issue are almost equally persuasive, but at the same time, unsatisfactory.  These provisions of the Code would benefit from legislative amendment or appellate precedent that might make application of the statute more uniform, while retaining the flexibility governing the Chapter 13 plan process.

A separate order will enter in each debtor's case in accordance with this decision.

By the Court,

Dated:  April 7, 2022

_____
Christopher J. Panos
United States Bankruptcy Judge

44